# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | Nan R. Nolan |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 913 | **DATE** | 6/20/2002 |
| **CASE TITLE** | USA vs. Samuel Ilori | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Report and Recommendation recommending that the District Court deny defendant Ilori's motion for suppression of evidence [26-1] is hereby entered of record. All matters relating to the referral of this action having been resolved, the case is returned to the assigned judge.

(11) ■ [For further detail see order attached to the original minute order.]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 01 CR 913 |
| ) | |
| SAMUEL ILORI, ) | Judge Elaine E. Bucklo |
| ) | |
| Defendant. ) | Magistrate Judge Nan R. Nolan |

## REPORT AND RECOMMENDATION

Federal agents and local law enforcement officers arrested Samuel Ilori and recovered approximately 163 grams of heroin from the car Ilori was driving immediately prior to his arrest. Subsequently, Ilori made several incriminating statements regarding his involvement in illegal drug transactions. Ilori moved the District Court to suppress all items seized and all fruits of the search of his vehicle, including any statements that he made, arguing that the agents seized the evidence in violation of the Fourth Amendment to the United States Constitution. The District Court referred Ilori's Motion for Suppression of Evidence (Docket Entry #26) to this Court. On June 12, 2002, the Court conducted an evidentiary hearing on the suppression motion. The Court's findings of fact and conclusions of law are set forth below. For the following reasons, the Court recommends that the District Court DENY Ilori's suppression motion.

### Findings of Fact

On the morning of October 30, 2001, federal agents conducted surveillance of suspected narcotics sales near the corner of Lavergne Street and Chicago Avenue in Chicago, Illinois. During the surveillance, the agents observed an individual (who was later identified as Clifton Coleman)

who appeared to be directing drug sales. Coleman then got into a black pick-up truck and drove to a residence located at 2914 Adams Street in the nearby suburb of Bellwood, Illinois. Coleman entered and left the residence and then drove two blocks to a storage facility. After Coleman exited the storage facility, the agents approached and spoke to him. Coleman told the agents that he was on parole, admitted his involvement in heroin sales near the corner of Lavergne Street and Chicago Avenue and stated that the storage unit he had just visited contained approximately $20,000 which had been derived from previous drug sales. After obtaining Coleman's consent, the agents searched the storage unit and uncovered, among other things, $35,000 and seventy-six grams of heroin.

Coleman identified his heroin source as a Nigerian male named "Sam." According to Coleman, he had made four heroin purchases from "Sam" in the last month, usually in 200 gram quantities per purchase. Coleman agreed to call "Sam" to arrange for the purchase of another 200 grams of heroin. Coleman told the agents that he would talk to "Sam" in code so that "Sam" would not be suspicious. The agents recorded the 12:01 p.m. call from Coleman to "Sam." (Gov. Ex. #1.) Special agent William J. Warren, Jr. of the United States Drug Enforcement Agency listened to the call as it occurred. During the call, "Sam" agreed to deliver "two" to the "old man's house" within thirty-five to forty minutes. (*Id.*)[1] Coleman told the agents that "Sam" drove a black Nissan and that

---

[1] Here is a transcript of the Coleman-to-"Sam" phone call:

| | |
|---|---|
| "Sam" | Hello. |
| Coleman | Hello. |
| "Sam" | Yes. |
| Coleman | Yeah, how long would it take me to, uh meet me by the old man's house? |
| "Sam" | Uh, I find out. |
| Coleman | Huh? |
| "Sam" | Thirty-five, about thirty-five or forty minutes. |
| Coleman | Thirty or forty minutes, Uh, I want, he want two. Two, yeah. |
| "Sam" | Uh, Okay. |
| Coleman | Uh, alright then, I want, I'm uh, I'm right out here. I'm around the corner at the |

the "old man's house" was the residence at 2914 Adams Street. At approximately 12:45, "Sam" called Coleman and said that he was on the way and that he would be there in thirty to forty minutes. Coleman then stood in front of 2914 Adams Street and waited for "Sam" to arrive. Federal agents and local law enforcement officers waited in their cars nearby.

At about 1:15 p.m., Samuel Ilori, driving a black Nissan Ultima, turned onto Adams Street. Coleman, who was still standing in front of the old man's house, contacted agent Warren via a two-way radio in his cell phone and told him that "Sam" was driving down the street. Ilori stopped his car in front of 2914 Adams Street.[2] At that moment federal agents and local law enforcement officers surrounded Ilori's car. Agent Warren, who was on foot, moved quickly to the driver's side of the Nissan. Other agents positioned their cars directly in front and behind Ilori's automobile, eliminating Ilori's ability to drive away. While agent Warren was approaching Ilori's car, other agents and officers got out of their vehicles and positioned themselves next to their vehicles. At least three of these individuals had their guns drawn and pointed towards the ground. As he opened the driver-side door of the Nissan, agent Warren both identified himself as a federal agent and identified Ilori as "Sam." At that time, Ilori admitted that he was Samuel Ilori. Agent Warren recognized Ilori's voice as the voice of "Sam" from the Coleman-to-"Sam" phone call recorded earlier that day. He also recognized the name Samuel Ilori as a name he had heard in connection with other heroin investigations. As agent Warren ordered Ilori to exit the vehicle, he noticed a black plastic bag

---

|  | restaurant. I'll be there before you get there. |
|---|---|
| "Sam" | Okay, I'm leaving now. |
| Coleman | Alright. |

[2] At the hearing, Ilori's counsel argued that Ilori stopped his car because police cars blocked his progress. Based on the evidence presented at the suppression hearing, the Court concludes that Ilori stopped his car in front of 2914 Adams Street before the police cars parked blocked him in.

-3-

containing a greyish-white box on the passenger-side floorboard. Agent Warren could not see the contents of the box. Agent Warren asked Ilori if he could search the vehicle and Ilori consented to the search. At that point agent Warren directed Ilori to two officers standing near the rear of the Nissan and then began his search of the car. The two officers conducted a pat-down search of Ilori. As the officers concluded the pat-down search, agent Warren indicated that he had uncovered heroin pellets from the greyish-white box.[3] The officers then handcuffed Ilori, read him the *Miranda* warnings, and formally placed him under arrest.

Ilori agreed to speak with the federal agents. The agents placed Ilori in a car and interviewed him. Ilori admitted that he had driven to that location to deliver 163 grams of heroin to Coleman. Ilori also admitted to participating in four previous heroin transactions with Coleman. Finally, Ilori related that he had dealt heroin in the years 1992 to 1997, averaging about 200 grams per month. The officers then transported Ilori to a detention facility where he was processed. At the facility, Ilori signed a waiver-of-rights form, (Gov. Ex. #2), and reiterated the same statements he had previously made to the agents in the car on Adams Street.

At the hearing, the defendant did not present any evidence. However, Ilori submitted an affidavit stating that he did not consent to the search of his car. Ilori's affidavit also states that the facts contained in the motion to suppress are true and correct to the best of his knowledge. The motion to suppress states that the agents "removed him from the vehicle, pushed him face down on the ground, cuffed him and placed him under arrest." (Def.'s Mot. to Suppress at 2-3.) In contrast, the agents testified that Ilori was never thrown to or placed on the ground during the entire

---

[3] A chemical analysis report indicates that the pellets contained 163.7 grams of a substance consisting primarily of heroin hydrocholoride. (Gov. Ex. #3.)

encounter. The Court finds the testimony of the agents credible and concludes that the agents never placed Ilori on the ground.

**Burden of Proof**

The Fourth Amendment protects people against unreasonable searches and seizures. U.S. Const. amend. IV. The general rule is that a search is unreasonable unless the government first obtains a warrant supported by probable cause. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). There are, however, exceptions to the general rule. *Id.* (collecting cases). Where, as in this case, the government obtains evidence pursuant to a warrantless search, the government bears the burden of establishing that one of the exceptions to the warrant requirement applies. *Id.*

**Discussion**

The government primarily argues that the seizure of evidence from Ilori's car did not violate the Fourth Amendment because the agents had probable cause to arrest Ilori and because the search of Ilori's car was incident to that lawful arrest. The government also presents two alternative arguments. The government's first alternative argument is that (i) the agents had reasonable suspicion to stop Ilori, (ii) after learning additional information during the investigatory stop, e.g., that Ilori was "Sam," the agents had probable cause to arrest him, and (iii) the search of the car was incident to the arrest. The government's second alternative argument is that the agents had reasonable suspicion to stop Ilori and then Ilori consented to the search of his vehicle. Because Ilori principally contends that the agents lacked legal authority to detain and arrest him, the Court begins its analysis with the issue of probable cause.

## I. Probable Cause to Arrest Ilori

Police officers may arrest an individual without a warrant provided that, in light of the facts and circumstances within their knowledge at the time of the arrest, they could reasonably believe that the suspect had committed or was committing an offense. *United States v. Watson*, 423 U.S. 411, 416-18 (1976); *United States v. Rosario*, 234 F.3d 347, 350 (7th Cir. 2000); *United States v. Scott*, 19 F.3d 1238, 1242 (7th Cir. 1994). Due to its fact-sensitive nature, there is no precise test for determining probable cause. *See Illinois v. Gates*, 462 U.S. 213, 232 (1983) (stating that probable cause is a "fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules"); *United States v. McClinton*, 135 F.3d 1178, 1183 (7th Cir. 1998) (same).

"Information from an informant can provide probable cause for an arrest if the information is reliable." *Rosario*, 234 F.3d at 350-51. Although the fact that an informant has previously provided credible information supports a finding of reliability, a prior history of providing credible information is not required. *Gates*, 462 U.S. at 246 (holding that corroboration of a highly detailed tip by an anonymous informant provided police officers with probable cause); *see also Rosario*, 234 F.3d at 351 (holding that corroboration of information from previously unknown informant provided officers with probable cause). In this case, the government argues that it had probable cause to arrest Ilori based on the government's corroboration of Coleman's information.

Coleman told officers that he dealt heroin, that his supplier was a Nigerian male named "Sam" who drove a black Nissan, and that "Sam" delivered drugs to him at 2914 Adams Street—which they referred to as the "old man's house." In addition, Coleman placed a recorded telephone call to "Sam" requesting that "Sam" deliver drugs to the "old man's house," and identified Ilori as "Sam" when Ilori arrived at Adams Street. The agents' prior observations of Coleman's

activity at the corner of Lavergne Street and Chicago Avenue and the subsequent search of the storage unit recently visited by Coleman confirmed that Coleman was involved in dealing heroin. The agents also had reason to believe that the residence at 2914 Adams Street may be connected to Coleman's drug dealing activities. Before Coleman knew that he was under surveillance, the agents observed Coleman direct heroin sales at the corner of Lavergne Street and Chicago Avenue, travel to the residence at 2914 Adams Street, and then visit a nearby storage unit where the agents subsequently uncovered heroin and the proceeds of previous drug deals. The agents also corroborated the following information: (1) "Sam" drove a black Nissan; (2) "Sam" stopped his car in front of 2914 Adams Street; (3) "Sam" appeared to be of African decent; and (4) "Sam" arrived at the time indicated in the second phone call. All of this information suggests a fair probability that Ilori was "Sam" and that he was delivering drugs to Coleman. *See Alabama v. White*, 496 U.S. 325, 331 (1990) (reasoning that if certain aspects of informant's tip have been confirmed then "[the informant] is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity").

Two other factors also contribute to the Court's conclusion that the agents had probable cause to arrest Ilori. First, Coleman's admission that he engaged in four previous heroin transactions with "Sam" was a statement against his penal interest. "Admissions of crime . . . carry their own indicia of credibility—sufficient at least to support a finding of probable cause . . . That the informant may be paid or promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct." *United States v. Harris*, 403 U.S. 573, 583-84 (1971); *see also United States v. Johnson*, 289 F.3d 1034, 1039 (7th Cir. 2002) (reasoning that informant made statement against penal interest by admitting prior drug distribution and use). Second, although the Coleman-to-"Sam"

phone calls never explicitly stated that the participants were planning to deal drugs, the Court concludes that circumstances surrounding the phone calls, as well as the calls themselves, indicated a fair probability that criminal activity was afoot. The agents knew that one of the participants in the phone calls—Coleman—was a drug dealer. Also, Coleman's use of the word "two" to order 200 grams of heroin was consistent with his reasonable explanation that he needed to use code words so that "Sam" would not be suspicious. *See United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995) (noting that "drug dealers rarely speak openly about their trade; instead, they often engage in a so-called 'narcotics code'"). Similarly, Coleman and "Sam" used a code word for the location of the meeting—the "old man's house"—a residence that Coleman had visited during his drug dealing activities earlier that day. Accordingly, although the phone call participants never mentioned "drugs" or "heroin," the Court concludes that the phone calls strongly suggested a scenario in which two individuals were planning to deal drugs.

Ilori argues that the government did not have probable cause because the agents had no indication that Coleman was a reliable informant. Ilori cites *Wong Sun v. United States*, 371 U.S. 471 (1963), and *Gatlin v. United States*, 326 F.2d 666 (D.C. Cir. 1963), as holding that information from an accomplice who has just been arrested and who has not previously provided reliable information is insufficient to establish probable cause. The Court concludes that Ilori reads these cases too broadly. In *Wong Sun*, the Supreme Court held that the government failed to establish probable cause because the informant was not shown to be reliable *and* because the information provided by the informant was vague and non-specific. *Wong Sun*, 371 U.S. at 480-82. Similarly, in *Gatlin*, the police arrested the defendant based solely on information provided by another suspect who confessed and then implicated the defendant in the crime. The *Gatlin* court, relying on *Wong*

*Sun*, held that the police lacked probable cause to arrest the defendant because the arrest was based "solely on information obtained from an accomplice whose reliability is neither alleged or established." *Gatlin*, 326 F.2d at 671. In contrast, in this case, Coleman's statements against his penal interest provided some indicia of reliability. Moreover, Coleman, under government supervision, set up a meeting with Ilori that was strongly suggestive of a narcotics transaction and the government corroborated important aspects of the information provided by Coleman.

Ilori next argues that the agents should have been more skeptical of Coleman's information because, after he was arrested, Coleman had a motivation to shift the blame for his activities to Ilori. The problem with this argument is that Coleman did not attempt to minimize his role in the offense or shift any blame to Ilori. Coleman confessed to dealing drugs on the day the agents had him under surveillance. He also confessed to dealing drugs on previous occasions. The fact that Coleman then agreed to assist the agents so as to decrease the penalty for his own criminal activities does not establish that he was attempting to shift the blame for those activities to Ilori.

Finally, Ilori suggests that Coleman's information was suspect because it only provided information that was readily observable. Ilori relies on *United States v. Roberson*, 90 F.3d 75 (3d Cir. 1996). In *Roberson*, the police received an anonymous phone call that provided a description of a man that the caller claimed was selling drugs at a particular corner. After arriving on the scene, the police officers arrested the suspect even though they did not observe him engage in any suspicious activity. The *Roberson* court held that the anonymous tip did not provide the officers with reasonable suspicion to stop the suspect because the tip provided only readily observable facts. *Id.* at 80. *Roberson* is clearly distinguishable. First, Coleman was not an anonymous informant. He was in police custody at the time he set up the drug deal with Ilori. Second, Coleman did not

relay readily observable facts. Rather, Coleman, in the presence of the agents, set up a drug deal with an individual named "Sam," and then provided a description of both "Sam" and the car "Sam" would be driving. The agents arrested Ilori—whose personal appearance and car met the descriptions provided by Coleman—after he arrived at the correct time and place for the drug deal.

Probable cause is said to exist where the totality of the circumstances indicate a fair probability that the suspect had committed or was committing an offense. *Watson*, 423 U.S. at 416-18. Based on all of the information available to the agents at the time Ilori stopped his black Nissan in front of 2914 Adams Street, the Court concludes that the agents had probable cause to arrest Ilori.

## II. Search Incident to Arrest

In *Chimel v. California*, 395 U.S. 752 (1969), the Supreme Court held that incident to a lawful custodial arrest, a police officer may contemporaneously search (without a warrant) the person and the area within the arrestee's immediate control. The justification of this exception to the Fourth Amendment's warrant requirement was to prevent the arrestee from grabbing a weapon or destroying evidence. *Id.* at 762-63. In *New York v. Belton*, 453 U.S. 454 (1981), the Supreme Court was asked to apply *Chimel* to a search incident to the arrest of an occupant of a vehicle. Noting the difficulties in applying *Chimel* to situations involving vehicles, the Supreme Court adopted a bright-line rule that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile," including the contents of any containers. *Id.* at 460-61. The Court specifically noted that *Belton* only applies to automobiles and that "container" means any object, open or closed, which is capable of holding another object, such as glove compartments, luggage, boxes, bags, clothing, etc. *Id.* at 460 n.3, 461 n.4.

The Court concludes that *Belton* applies to this case. It is undisputed that the agents initiated contact with Ilori while he was an occupant of the vehicle. The Court also notes that *Belton* applies even though (1) the agents detained Ilori outside of his vehicle before the search, *United States v. Richardson*, 121 F.3d 1051, 1056-57 (7th Cir. 1997) (holding that *Belton* applies even when suspect secured in squad car while his vehicle is being searched), and (2) the search began before Ilori was formally arrested, *see Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) (stating that "[w]here the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa"); *United States v. Miller*, 925 F.2d 695, 698 (4th Cir. 1991) (holding that a search incident to arrest may precede the formal arrest, provided that "the formal arrest quickly follows the challenged search" and there is probable cause to arrest at the time of the search). Accordingly, based on the rule announced in *Belton*, the Court concludes that the search of Ilori's car did not violate the Fourth Amendment because the agents searched the car incident to the lawful arrest of Ilori.

## III. Reasonable Suspicion

Even if the Court were to determine that the agents initially lacked probable cause to arrest Ilori, the Court would still conclude that the agents had a reasonable suspicion that Ilori had narcotics in his vehicle. A reasonable suspicion analysis is essentially the same as a probable cause determination except that, given the relatively minimal intrusion, the required degree of suspicion is not as high. *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989). A stop based on reasonable suspicion must be based on "some minimal level of objective justification"; it must be based on more than a "hunch" but it requires less than a "fair probability that contraband or evidence of a crime will be found." *Id.* at 7 (internal quotations and citations omitted). For the reasons stated in

the probable cause section of this opinion, *see supra* at 6-10, the Court concludes that the information available to the agents provided the requisite "minimal level of objective justification" for stopping Ilori's car. Once agent Warren spoke to Ilori, he received additional information that, together with all of the previous information, established probable cause to arrest Ilori. Specifically, agent Warren (1) confirmed that Ilori was "Sam" from the recorded phone call, (2) learned that the suspect's full name was Samuel Ilori—a named agent Warren recognized from other heroin investigations, and (3) observed a package on the passenger side floorboard of the car. Based on this additional information, the agents had probable cause to arrest Ilori and, therefore, the search of the car incident to that arrest did not violate the Fourth Amendment. *See supra* at 10-11.

## IV. Consent

Even if the Court were to determine that the agents lacked probable cause to arrest Ilori at any time during their encounter with Ilori on Adams Street, the Court would conclude that the search of Ilori's car did not violate the Fourth Amendment because the agents had reasonable suspicion to stop Ilori and then Ilori consented to the search. At the suppression hearing, the agents testified that Ilori consented to the search of his vehicle. Ilori submitted an affidavit stating that he did not consent to the search. Because the Court finds the testimony of the agents to be credible, the Court finds that Ilori consented to the search. Ilori alternatively argues that his consent was involuntary because of the agents had their guns drawn and threw him to the ground to handcuff him. Based on the testimony at the suppression hearing, the Court finds that although at least three agents had their weapons drawn, none of the guns were pointed at Ilori. Furthermore, the Court finds that Ilori was not thrown to or placed on the ground or otherwise physically assaulted or threatened during the

encounter on Adams Street. Accordingly, the Court concludes that there is no evidence that Ilori's consent was involuntary.

## Conclusion

For the foregoing reasons, this Court recommends that the District Court DENY Ilori's motion for suppression of evidence. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes waiver of the right to appeal. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

**ENTER:**

*Nan R. Nolan*

**Nan R. Nolan**

**United States Magistrate Judge**

Dated: 6/20/02